Filed 1/28/22  In re M.E. CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| In re M.E. et al., Persons Coming Under the Juvenile Court Law. | |
| SAN BERNARDINO COUNTY CHILDREN AND FAMILY SERVICES, | E077620 |
| Plaintiff and Respondent, | (Super. Ct. Nos. J279266 & J283488) |
| v. | OPINION |
| T.B., | |
| Defendant and Appellant. | |

APPEAL from the Superior Court of San Bernardino County.  Steven A. Mapes, Judge.  Affirmed.

Joseph T. Tavano, under appointment by the Court of Appeal, for Defendant and Appellant.

Steven O'Neill, Interim County Counsel, and Pamela J. Walls, County Counsel, for Plaintiff and Respondent.

1

## INTRODUCTION

T.B. (Mother) appeals from a juvenile court order terminating her parental rights to two of her five children, three-year-old M.E. and two-year-old K.E. (Welf. & Inst. Code,[1] § 366.26), and an order denying her section 388 petition.[2] Mother contends the juvenile court abused its discretion in denying her section 388 petition without an evidentiary hearing. She also argues the court's order finding the beneficial relationship exception to adoption (§ 366.26, subd. (c)(1)(B)(i)) did not apply should be reversed and the matter remanded because the court's findings did not comply with the principles announced in *In re Caden C.* (2021) 11 Cal.5th 614 (*Caden C.*). We find no error and affirm the juvenile court's orders.

## II.

## FACTUAL AND PROCEDURAL BACKGROUND

The family came to the attention of the San Bernardino County Children and Family Services (CFS) on December 31, 2018, after a referral was received alleging emotional abuse, caretaker absence/incapacity, and general neglect. Mother had been having "'mood swings'" and threatening people with a knife. Father had taken then two-month-old M.E., who was dressed only in a onesie, and placed her in the middle of a

---

[1] All future statutory references are to the Welfare and Institutions Code unless otherwise stated.

[2] J.E. (Father) is not a party to this appeal.

2

desert road in 30 degree weather. Father had choked and punched Mother. Mother had vandalized a taxi cab belonging to the maternal aunt's boyfriend, causing $1,500 in damages. Both parents were intoxicated and taken into custody.[3]

M.E. was taken into protective custody, and on January 3, 2019, a petition was filed on behalf of M.E. pursuant to section 300, subdivisions (a) (serious physical harm), (b) (failure to protect), and (g) (no provision for support). M.E. was formally detained and removed from parental custody the following day at the detention hearing. Mother was provided with visitation two times per week for two hours, and CFS was ordered to provide the parents with services pending the case plan. Mother had a history with mental illness. When she was taken into custody, she informed the officers that she was schizophrenic and had many different personalities. She also made bizarre and suicidal statements, screamed, and inappropriately laughed while in the patrol unit. Mother acknowledged that she had a history with mental illness and noted that she was not currently seeing a psychiatrist. She also admitted the domestic violence incident perpetrated by Father, but noted that it was "'the first time'" and that she intended to stay with Father because he supported her.

Father was not interested in participating in pre-dispositional services. Mother had begun participating in services and was attending Alcoholic Anonymous/Narcotics

---

[3] Father was charged with assault with a deadly weapon, child endangerment, and making criminal threats. Mother was charged with vandalism.

3

Anonymous (AA/NA) and parenting classes. She had three negative drug test results, but was a no show for two dates.

The jurisdictional hearing was held on April 17, 2019. Neither Mother nor Father were present in court. The juvenile court found true all allegations in the petition except for the section 300, subdivision (g) allegations, which the court dismissed.

The contested dispositional hearing was held on June 11, 2019. Both parents were present. The juvenile court declared M.E. a dependent of the court, formally removed the child from parental custody, and provided the parents with reunification services and supervised visitation two times per week for two hours or one time a week for four hours. The court also ordered the parents to undergo a psychological evaluation, over the parents' objections.

By the six-month review hearing, CFS recommended that reunification services continue for Mother and that services be terminated for Father. Mother had made good progress with her case plan, and claimed that she was currently not in a relationship with Father. She was employed and resided in a hotel, but was working on obtaining stable housing. She had completed a domestic violence program, eight sessions of anger management classes, four sessions of general counseling, and eight sessions of parenting education. However, Mother had approximately 12 "'no shows'" for random drug testing. She also had not been attending AA/NA meetings, did not appear to be working on her 12-steps, and had not completed relapse prevention/aftercare classes. Father did not want to participate in services.

4

Mother's psychological evaluation revealed that she had a history of mental illness, inconsistency in taking her prescribed medications, problems with anger management, history of substance use, and abuse since adolescence. The psychologist diagnosed Mother with "mood regulation difficulties, specifically Bipolar I Disorder," in which she had periods of depressive and manic episodes. She was also diagnosed with "Attention-Deficit/Hyperactivity Disorder, Alcohol Use Disorder, and Amphetamine-Type Substance Use Disorder, in sustained remission." The psychologist concluded that Mother's history of substance abuse and her failure to recognize it as a problem placed her at risk for relapse and that her substance abuse exacerbated her mood disorder and compromised her ability to manage anger. The psychologist recommended that Mother receive psychoeducation regarding her mental illness and to help manage her mood, referrals for medication consultation with a psychiatrist, and continued participation in individual counseling and substance abuse treatment, anger management, domestic violence, and parenting classes.

Mother regularly visited M.E. with no concerns. During visits, Mother engaged with M.E. in a loving and positive manner, played with the child, and actively attended to the child's basic needs.

At the six-month review hearing on December 11, 2019, the juvenile court continued Mother's reunification services and terminated Father's services.

Five days later, on December 16, 2019, CFS filed a petition on behalf of K.E. pursuant to section 300, subdivisions (b), (g) and (j). Four days earlier, CFS had received

5

a referral alleging general neglect after Mother had accidently revealed to a visitation monitor that she had given birth to a baby in November 2019. Mother reluctantly signed a declaration authorizing temporary detention of then one-month-old, K.E. She was emotional, denied hiding K.E. from CFS, and did not understand why K.E. had to be detained since she was doing "'everything'" asked of her by CFS. Mother also stated that since CFS had never asked her about her pregnancy, "she did not feel the need to openly discuss it." The social worker explained that Mother had missed multiple drug tests, which was a cause for concern. Mother was a "no show" for random drug testing on August 8, 2019, August 16, 2019, November 14, 2019, November 20, 2019, and December 9, 2019.

On December 17, 2019, K.E. was formally detained and placed in the same foster home with M.E. K.E. appeared safe and well cared for at the time of her removal. Mother had unsupervised visits with K.E. at the CFS office and was reported to be attentive to the child and properly engaged. While Mother had made progress on her reunification plan, she still had not completed a relapse prevention program and failed to consistently drug test. She also needed to complete a parenting program tailored to the age group of her children. In addition, despite not being in a relationship with Father, Mother had relied on Father financially to support her. Father was also present at K.E.'s birth. It also appeared that Mother had not been compliant with her psychotropic medication and she had not completed her individual counseling. CFS believed that

6

Mother had not fully benefitted from the services provided to her, but noted that Mother was working diligently towards reunifying with both children.

CFS's review of Mother's child welfare history revealed that Mother had a son, J.W., who was in the care of the Los Angeles County Department of Children and Family Services (LA DCFS) from September 2015 through October 2017. Mother was offered reunification services through LA DCFS. Her services were eventually terminated and J.W. was placed with the maternal grandmother under legal guardianship. When CFS inquired about J.W., Mother stated that it was not CFS's business to know about her son. CFS also discovered that Mother had another child in the state of Texas. When CFS inquired about this child, Mother reported the child was adopted.[4]

On December 2, 2020, Mother informed CFS that she was pregnant and due in March 2021. She claimed that she was receiving prenatal care and did not know the identity of the father.

On February 13, 2020, Mother submitted a waiver of rights form, and the parties participated in mediation. At mediation, CFS agreed to provide additional reunification services to Mother, and Mother agreed to complete counseling, parenting classes, domestic violence classes, and consistently drug test. Mother also agreed to attend

---

[4] CFS later discovered that Mother had a prior dependency case in New Mexico involving J.W. and another child, Z. J.W. was with the maternal aunt when she was arrested for dealing methamphetamines. The children had been abandoned by Mother after she had been arrested and incarcerated in Texas and New Mexico. When J.W. was detained, he had an injured top lip, burn or scald marks on both his feet and numerous bruises or marks on his buttocks and on the back of both thighs. Mother failed to visit J.W. or to participate in reunification services.

psychiatric appointments and work with CFS in securing a shelter or transitional housing as soon as possible.

On February 13, 2020, the juvenile court found the allegations in K.E.'s petition true except the section 300, subdivision (g) allegations, which were dismissed. The court declared K.E. a dependent of the court and provided Mother with reunification services and unsupervised visitation a minimum of one time a week for two hours.

Mother regularly participated in her services, but continued to struggle with consistently drug testing, remaining employed, and obtaining stable housing. CFS had provided Mother assistance with housing at Mama's House in Palm Desert that provided housing, counseling, substance abuse treatment, employment assistance, and assistance in educational goals. Mother, however, declined this placement, stating "'I'll think on it, but look I got me this far, being where I am and I am positive I will continue to do it.'" Mother claimed she later called the director and was informed there were no longer any openings and to call back in three weeks.

CFS also helped Mother secure financial assistance from the welfare office and childcare. Mother wanted the children's caregivers to provide childcare after reunification, but the caregivers were unable to do so. Father had been released from jail and was providing some financial support. Mother claimed that she had stabilized and was compliant with her psychotropic medication, but the social worker discovered her medication was untouched and had expired. Mother stated she did not need the medication. Mother was participating in counseling and parenting classes, but had not

8

yet completed them. In addition, she had seven no-shows for random drug testing. Mother's visits with the children, however, were consistent with no reported concerns noted.

By the June 2020 18-month review hearing in M.E.'s case, Mother was staying temporarily with the maternal aunt. CFS provided Mother with several housing resources however, Mother claimed that she did not receive a letter notifying her of the availability of an apartment. She also claimed to not receive a call back from another housing resource. She did not want to go to Mama's House because it was a shelter and she had the financial means to find an alternative place. She was working at Stater Brothers and Burger King. Mother continued to insist she could obtain housing on her own, even after the social worker warned her the 18-month review hearing was approaching and she was running out of time. When the social worker followed up with Mother on July 24, 2020 concerning housing, Mother informed the worker that she was no longer residing with the paternal aunt and was staying at different hotels each night. Mother stated that she had not pursued the housing resources CFS had provided. The social worker gave Mother another local resource that provided mental health services and housing. Mother had missed three random drug tests during the reporting period; two conflicted with her work schedule and one because she forgot a mask. She had completed her parenting and anger management classes and was almost done with her counseling requirement. She had also been compliant with her psychotropic medication.

Mother continued to regularly visit the children. The caregivers had allowed Mother to have visits in their home rather than video visits due to the pandemic. During the visits, Mother began to ask the caregivers to change the children and to complete other tasks for her. In addition, Mother had Father drive her to a visit when the caretaker's address was confidential. CFS thus requested the visits return to supervised visits.

On June 30, 2020, the juvenile court ordered the visits to return to supervised and continued the 18-month review hearing to October 7, 2020.

On August 13, 2020, the juvenile court continued Mother's reunification services in K.E.'s case. Mother's visits continued to be supervised one time a week for two hours, and she consistently visited the children. During the visits, Mother met the children's needs. The only concern noted was Mother's failure to bring activities for the children to engage in during the visits.

By October 2020, Mother had missed two drug tests in June 2020. She had been laid off from her jobs and was receiving unemployment. Mother believed she may be pregnant again and had applied for pregnancy benefits. Mother's counselor recommended six more counseling sessions to allow Mother to meet her goals. Mother was initially hesitant, believing she had met her case plan requirements, eventually agreed to participate in additional sessions.

At the October 7, 2020 18-month review hearing in M.E.'s case, the juvenile court terminated Mother's reunification services. The court found that it was not in M.E.'s best

interest to set a section 366.26 hearing at that time and ordered a permanent plan of foster care with return home. The court granted Mother reunification services under M.E.'s permanent plan for a period not to exceed six months and provided Mother with supervised visitations once a week for two hours.

In February 2021, Mother gave birth to her fifth child, J.B.[5] By March 2021, CFS recommended Mother's reunification services be terminated and a section 366.26 hearing be set for K.E. and M.E. with a specific goal of adoption. Mother had received 14 months of services for K.E. and 25 months of services for M.E. Nonetheless, Mother continued to deny any domestic violence issues with Father, failed to take any responsibility for the incidents that led to the children's removal, and blamed CFS for K.E.'s removal. She reported that she was compliant with taking her psychotropic medication, even though she had not seen a psychiatrist in five months and complained of having days where she could not get out of bed. She would not disclose the prescriber of her medication or sign a release to allow CFS to confirm her claim that she was compliant with her medication. She also continued to have an unstable living situation. She refused to reside temporarily in a shelter or program referred to her by CFS, despite the program allowing Mother to reside there with her children, because it interfered with her lifestyle. Mother insisted that she could find housing on her own, but was alternating from living with family and friends to hotel rooms.

---

[5] Mother's fifth child J.B. was detained and placed with her half-siblings, M.E. and K.E.

Mother's visits had previously been ordered unsupervised, but reverted to supervised in June 2020 once the caregivers reported Mother was not overseeing the children's basic needs. During visits, Mother fell asleep while the children played unattended and had to be woken up at the end of visits. She also sat on the floor and directed then two-year-old M.E. to throw away the diapers and clean up the food and toys. Mother, however, made efforts to engage with the children, did their hair, and played with them. She reported that she did not know why she had children so close in age as she could not manage three babies.

On March 9, 2021, the juvenile court granted the caregivers' petitions for de facto parent status. The caregivers were also designated as the children's educational rights holders. M.E. had been placed with the caregivers since December 12, 2019, and K.E. since May 27, 2020. Both children were very bonded and attached to the caregivers and looked to them to have their needs met. They also looked to their caregivers for comfort and care and were thriving in their caregivers' home. The caregivers were meeting the children's medical and developmental needs and desired to provide them with stability and safety in a loving home. The children called their caregivers "dad" or "daddy." The caregivers were willing to have Mother maintain a relationship with the children, if appropriate and in the children's best interests.

On March 9, 2021, the juvenile court terminated Mother's services under M.E.'s plan, ordered a permanent plan of adoption for M.E., and set a 366.26 hearing. The court also terminated Mother's reunification services for K.E. and set a 366.26 hearing in

K.E.'s case. The juvenile court explained it was not terminating Mother's services because of her housing difficulties, but due to her failure to benefit from the services provided to her.

On August 5, 2021, the same day as the section 366.26 hearing, Mother filed a section 388 petition, seeking a return of the children to her custody, or in the alternative, reinstatement of reunification services. As a change of circumstances, Mother alleged that she had completed parenting classes, a domestic violence program and anger management classes, had attended AA/NA meetings, and had obtained stable housing. In support, she attached certificates of competition and a copy of a lease. Mother claimed it was in the children's best interest to be raised by their biological mother.

On August 9, 2021, CFS informed the court that Mother continued to be reliant on the eldest child M.E. during visits. While she remained seated, Mother had directed M.E. to pick up food and water bottles during visits. She had also directed M.E. to assist her with the younger children. Although Mother played music for the children and sang with them, her interaction with the children was minimal. Mother tended to remain seated in one spot during visits. The children had been observed to regress during visits with Mother, and when their caregiver arrived, the children eagerly ran to their caregiver to leave. Mother had reported to the visitation monitor that she heard voices when off her medication, but that when she took her medication, she was sleepy. She had also stated that if she had a choice, she would not have had the children and would chose M.E. over the other children because M.E. was more bonded to her. In addition, despite not having

a driver's license, Mother drove to her visits. CFS was concerned whether Mother would be able to meet the children's needs if she reunified with the children. CFS worried that Mother still struggled with her mental health and aggression, as well as the children's lack of bond to Mother.

On August 11, 2021, the juvenile court denied Mother's section 388 petition. The court found the request did not state new evidence or a change of circumstances and that it was not in the children's best interests. The court thereafter proceeded to the contested section 366.26 hearing in K.E. and M.E.'s cases.

At the conclusion of the section 366.26 hearing, citing *Caden C.*, *supra*, 11 Cal.5th 614, the juvenile court found that although Mother had consistently visited the children, Mother had not developed a significant bond or relationship to the children such that the severance of that relationship would be detrimental to the children. The court concluded that the children were not bonded to Mother, but to their caregivers as their parental figures, and that the parental relationship between Mother and the children was incidental and not significant. The court also determined that the benefits of maintaining a parent-child relationship were not outweighed by the benefits of adoption. The court thus found the beneficial parental relationship exception to adoption did not apply, terminated parental rights, and concluded the children were adoptable. Mother timely appealed.

III.

DISCUSSION

A. *Denial of Section 388 Petition*

Mother contends the juvenile court abused its discretion in denying her section 388 petition seeking return of the children to her care, or alternatively, reinstatement of services and increased visitation without an evidentiary hearing. Mother argues she made the requisite prima facie showing entitling her to a hearing. We disagree.

We review the juvenile court's denial of Mother's section 388 petition without an evidentiary hearing for abuse of discretion. (*In re C.J.W.* (2007) 157 Cal.App.4th 1075, 1079.) The denial must be upheld unless we can determine from the record that the juvenile court's decision exceeded the bounds of reason. When two or more inferences can reasonably be deduced from the facts, we have no authority to substitute our decision for that of the juvenile court. (*In re Brittany K.* (2005) 127 Cal.App.4th 1497, 1505.)

A petition to modify a juvenile court order under section 388 must allege facts showing new evidence or changed circumstances exist and that changing the order will serve the child's best interests. (§ 388, subd. (a)(1)-(2); *In re Nolan W.* (2009) 45 Cal.4th 1217, 1235.) Courts must liberally construe a section 388 petition in favor of its sufficiency. (*In re Marilyn H.* (1993) 5 Cal.4th 295, 309.) However, section 388 requires a petitioner to make a prima facie showing of both elements to trigger an evidentiary hearing. (*In re Zachary G.* (1999) 77 Cal.App.4th 799, 806.) If, for instance, the parent makes a prima facie showing of changed circumstances, the juvenile court can

15

still deny the petition without an evidentiary hearing if the parent fails to make a prima facie showing that the relief sought would promote the child's best interests. (*In re Justice P.* (2004) 123 Cal.App.4th 181, 188-190; see *In re Alayah J.* (2017) 9 Cal.App.5th 469, 478; *In re Elizabeth M.* (1997) 52 Cal.App.4th 318, 322-323.)

"'A "prima facie" showing refers to those facts which will sustain a favorable decision if the evidence submitted in support of the allegations by the petitioner is credited.'" (*In re Josiah S.* (2002) 102 Cal.App.4th 403, 418.) Consequently, section 388 petitions with general, conclusory allegations do not suffice. Otherwise, "the decision to grant a hearing on a section 388 petition would be nothing more than a pointless formality." (*In re Edward H.* (1996) 43 Cal.App.4th 584, 593.) "In determining whether the petition makes the necessary showing, the court may consider the entire factual and procedural history of the case." (*In re Jackson W.* (2010) 184 Cal.App.4th 247, 258.)

Here, Mother's section 388 petition stated that she had completed a parenting program, a domestic violence program, and anger management classes and that she had attended AA/NA meetings and obtained stable housing. She claimed it was in the children's best interest to be raised by their biological mother. The petition failed to explain why return of the children to her care or reinstatement of reunification services would be in the best interest of the children. This failure was fatal to Mother's claim under section 388. The petition must show how a change of order would be in the best interest of the children. Moreover, as multiple Courts of Appeal have recognized,

completion of programs at a late stage in proceedings, while commendable, is not a substantial change of circumstances within the meaning of section 388. (*In re Ernesto R.* (2014) 230 Cal.App.4th 219, 223; *In re A.S.* (2009) 180 Cal.App.4th 351, 358 [completion of classes and participation in counseling not enough to show changed circumstances where father still unable to "provide the children a stable, safe, permanent placement"].) Thus, the juvenile court did not abuse its discretion in summarily denying Mother's section 388 petition.

Parent and child share a fundamental interest in reuniting up to the point at which reunification efforts cease. (*In re R.H.* (2009) 170 Cal.App.4th 678, 697, overruled on other grounds in *John v. Superior Court* (2016) 63 Cal.4th 91, 99, fn. 2.) By the time of a section 366.26 hearing to select and implement a child's permanent plan, however, the interests of the parent and the child have diverged. (*Cynthia D. v. Superior Court* (1993) 5 Cal.4th 242, 254.) Therefore, after reunification efforts have terminated, the court's focus shifts from family reunification toward promoting the child's needs for permanency and stability. (*In re Marilyn H.*, *supra*, 5 Cal.4th at p. 309.) In fact, there is a rebuttable presumption that continued foster care is in the best interests of the child. (*Id*. at p. 310.) "A court hearing a motion for change of placement at this stage of the proceedings must recognize this shift of focus in determining the ultimate question before it, that is, the best interests of the child." (*In re Stephanie M.* (1994) 7 Cal.4th 295, 317.)

Here, the evidence established that the children had spent most of their young lives with their caregivers. M.E. had been placed with the caregivers when she was a year old,

17

since December 12, 2019, and K.E. when she was six months old, since May 27, 2020. Both children were very bonded and attached to the caregivers and looked to them for comfort and to have their needs met. They were thriving in their caregivers' home, and the caregivers, who desired to adopt them, were meeting the children's needs. Meanwhile, there was no evidence to suggest the children were bonded to Mother or that Mother had benefitted from the services provided. She continued to live an unstable lifestyle, questioned why she had the children, minimized her mental health issues, acknowledged that she had no bond with the younger children, and was reliant on M.E. and the caregivers during visits.

Our role as a reviewing court is to assess whether the court below committed error based on the record before it, and we do not reweigh evidence or rely on evidence that was not in the court's record at the time it made its order. (*In re James V.* (1979) 90 Cal.App.3d 300, 304.) Based on the record before the juvenile court, we find the court did not abuse its discretion in denying the section 388 petition without an evidentiary hearing.

B. *Beneficial Relationship Exception*

Mother contends the juvenile court's order finding the beneficial relationship exception to adoption did not apply should be reversed and the matter remanded because the court's findings did not comply with the principles articulated in *Caden C.*, *supra*, 11 Cal.5th 614.

18

Section 366.26 governs the proceedings at which the juvenile court must select a permanent placement for a dependent child. The express purpose of a section 366.26 hearing is "to provide stable, permanent homes" for dependent children. (§ 366.26, subd. (b).) If the court determines it is likely the child will be adopted, the statute mandates termination of parental rights unless the parent opposing termination can demonstrate that one of the statutory exceptions applies. (§ 366.26, subd. (c)(1)(A) & (B).) In other words, the court must select adoption as the permanent plan unless "the parent shows that termination would be detrimental to the child for at least one specifically enumerated reason." (*Caden C.*, *supra*, 11 Cal.5th at p. 630.) The exceptions allow "'the court, in exceptional circumstances [citation], to choose an option other than the norm, which remains adoption.'" (*Id*. at p. 631, quoting *In re Celine R.* (2003) 31 Cal.4th 45, 53.)

Mother contends the exception found in section 366.26, subdivision (c)(1)(B)(i), i.e. the beneficial relationship exception, applied in her case. Recently, in *Caden C.*, our Supreme Court explained, for this exception to apply, a parent is required to show "(1) regular *visitation and contact*, and (2) a *relationship*, the continuation of which would *benefit* the child such that (3) the termination of parental rights would be *detrimental* to the child." (*Caden C.*, *supra*, 11 Cal.5th at p. 631.) "The first element—regular visitation and contact—is straightforward. The question is just whether 'parents visit consistently,' taking into account 'the extent permitted by court orders.'" (*Id*. at p. 632.) "As to the second element, courts assess whether 'the child would benefit from

19

continuing the relationship.' [Citation.] Again here, the focus is the child. And the relationship may be shaped by a slew of factors, such as '[t]he age of the child, the portion of the child's life spent in the parent's custody, the "positive" or "negative" effect of interaction between parent and child, and the child's particular needs.'" (*Ibid.*, quoting *In re Autumn H.* (1994) 27 Cal.App.4th 567, 576 (*Autumn H.*).) "Concerning the third element—whether 'termination would be detrimental to the child due to' the relationship—the court must decide whether it would be harmful to the child to sever the relationship and choose adoption." (*Caden C.*, *supra*, at p. 633.)

The Supreme Court's decision in *Caden C.* focuses primarily on the third element. The court rejected reliance on whether the parents have complied with their reunification services or case plan and explained, "Because terminating parental rights eliminates any legal basis for the parent or child to maintain the relationship, courts must assume that terminating parental rights terminates the relationship. [Citations.] What courts need to determine, therefore, is how the child would be affected by losing the parental relationship—in effect, what life would be like for the child in an adoptive home without the parent in the child's life. [Citation.] . . . [T]he effects might include emotional instability and preoccupation leading to acting out, difficulties in school, insomnia, anxiety, or depression [or] . . . a new, stable home may alleviate the emotional instability and preoccupation leading to such problems, providing a new source of stability that could make the loss of a parent not, at least on balance, detrimental. [¶] In each case, then, the court acts in the child's best interest in a specific way: it decides whether the

20

harm of severing the relationship outweighs 'the security and the sense of belonging a new family would confer.' [Citation.] 'If severing the natural parent/child relationship would deprive the child of a substantial, positive emotional attachment such that,' even considering the benefits of a new adoptive home, termination would 'harm[]' the child, the court should not terminate parental rights." (*Caden C.*, *supra*, 11 Cal.5th at p. 633, quoting *Autumn H.*, *supra*, 27 Cal.App.4th at p. 575.)

The parent must show that his or her relationship with the child "promotes the well-being of the child to such a degree *as to outweigh* the well-being the child would gain in a permanent home with new, adoptive parents." (*Autumn H.*, *supra*, 27 Cal.App.4th at p. 575, italics added; accord, *Caden C.*, *supra*, 11 Cal.5th at p. 632 [When "assessing whether termination would be *detrimental*, the trial court must decide whether the harm from severing the child's relationship with the parent outweighs the benefit to the child of placement in a new adoptive home."].) "A showing the child derives some benefit from the relationship is not a sufficient ground to depart from the statutory preference for adoption." (*In re Breanna S.* (2017) 8 Cal.App.5th 636, 646, disapproved on another ground in *Caden C.*, *supra*, at pp. 637, fn. 6., 638, fn. 7.) "A parent must show more than frequent and loving contact or pleasant visits." (*In re C.F.* (2011) 193 Cal.App.4th 549, 555.)

We review the juvenile court's findings as to whether the parent has maintained regular visitation and contact with the child and the existence of a beneficial parental relationship for substantial evidence. (*Caden C.*, *supra*, 11 Cal.5th at pp. 639-640.) We

review the third step—whether termination of parental rights would be detrimental to the child due to the child's relationship with his or her parent—for abuse of discretion. (*Id.* at p. 640.) We do not reweigh the evidence, evaluate the credibility of witnesses or resolve evidentiary conflicts. (*Autumn H.*, *supra*, 27 Cal.App.4th at p. 576.)

Here, the juvenile court found that Mother had met the first element of regular or consistent contact with the children. Substantial evidence in the record supports that Mother maintained regular visitation and contact with the children. The court then addressed the second element and impliedly the third element, noting Mother had not met these elements.

The court explained as follows: "The first prong by mom is met, not really by dad. The second prong hasn't been met by them. At this issue with the *Cayden* [*sic*] *C.* language where it appears that we're carving out something that is different than occupying a parental role, because it's possible to have a significant relationship, a parental bond with the child while not occupying that role. That's kind of the way I read that case anyway. Maybe I'm wrong, but it seems like they're trying to make a distinction, that, hey, wait a second, maybe we don't necessarily have to prove a parental role, but we have to prove a significant relationship or something like that, a significant bond. [¶] But in either case, here . . . in this case, we only have – it is a distinguished role because I only have evidence of Mother's perception of the relationship. Clearly all of the evidence sort of stands, as you pointed out, that the children are clearly strongly bonded to their caregivers as their parental figures as evidenced by reactions and things

22

like that. Even, I think, as testified to by mom so clearly, I don't find that there is a significant relationship or bond there. There is an incidental bond for sure, and I don't know the specular of qualification between incidental to significant wherein having a parent that visits and they know that's their parent, where does that fit, but that's where this is. [¶] This isn't significant. It is definitely incidental. There is some benefit. It could be beyond incidental. I'm not sure, frankly, but I think this is part of that whole sliding scale that we're just kind of looking at, but it's not even close to significant to raise a point that would satisfy this proposed new prong that we're talking about. And also there is no parental role fulfilled, so . . . I understand that we're kind of getting away from that language of parental role. I understand we're kind of looking beyond. I'm just kind of talking about both things. In any event, neither is satisfied."

While the juvenile court did not artfully explain its reasoning of the principles announced in *Caden C*., we disagree with Mother that the court did not comply with the principles articulated in *Caden C*., *supra*, 11 Cal.5th 614 or that the matter must be remanded. Assuming for the sake of argument that the children would benefit from continuing their relationship with Mother, the issue is whether the children shared such a "substantial, positive attachment" to Mother that the harm in severing the parental relationship would "outweigh[ ] 'the security and the sense of belonging a new family would confer.'" (*Caden C*., *supra*, at pp. 636, 633.) The juvenile court did not abuse its discretion by determining that any benefits derived from the children's relationship with Mother did not outweigh the benefit of stability through adoption. Under the balancing

23

test set forth in *Autumn H.* and approved by in *Caden C.*, we conclude the juvenile court acted within its discretion in terminating Mother's parental rights.

It was undisputed Mother loved the children and had generally positive visits with them. The record also shows that the children enjoyed their visits with Mother. But, as previously noted, "[a] parent must show more than frequent and loving contact or pleasant visits." (*In re C.F.*, *supra*, 193 Cal.App.4th at p. 555.) There was no evidence that the relationship was so significant as to outweigh the security and stability of an adoptive home. (Cf. *Caden C.*, *supra*, 11 Cal.5th at pp. 633-634 ["When the relationship with a parent is so important to the child that the security and stability of a new home wouldn't outweigh its loss, termination would be 'detrimental to the child *due to*' the child's beneficial relationship with a parent"]; *id.* at p. 635 [when a child has "'very strong ties'" with a parent and termination of parental rights "'is likely to be harmful to the child, courts should retain parental ties if desired by both the parents and the child'"].) Although the children presumably loved Mother and enjoyed their visits with her, there was substantial evidence that the children were bonded to their caregivers, whom they considered parental figures. This is especially likely considering M.E. had been placed with the caregivers since age one, and K.E. since age six months, and had been in their caregivers' home for most of their young lives.

The relationship Mother enjoyed with the children during their visits is not sufficient to demonstrate that Mother and the children shared such a substantial, positive emotional attachment that terminating Mother's parental rights would greatly harm the

24

children. The extent of Mother's influence over the children was necessarily limited; the record supports that the caregivers acted as primary influential parental figures in the minds of these young children. They did not look to Mother to attend to their physical, developmental, emotional, and other daily needs. (Cf. *Autumn H.*, *supra*, 27 Cal.App.4th at p. 575 [positive emotional attachment results from an adult's attention to a child's needs for physical care, nourishment, comfort, affection, and stimulation, typically arising from day-to-day interaction, companionship, and shared experiences].)

Further, the record supports that the children's well-being would greatly improve when permanently adopted by fully attentive parents. Since being placed with their caregivers, the children were thriving due to excellent care by their caregivers. (Cf. *Caden C.*, *supra*, 11 Cal.5th at p. 633 [losing the parental relationship might result in "emotional instability and preoccupation leading to acting out, difficulties in school, insomnia, anxiety, or depression"].) Perhaps most importantly, adoption would bring the children stability and permanency.

Mother also did not present any evidence that the children would be greatly harmed by severance of the parental relationship, or that the security and stability of a new home would not outweigh the loss of that relationship. There was no evidence that terminating Mother's parental rights would be detrimental to the children. Mother did not, for example, offer a bonding study or other evidence showing that termination of parental rights would have a significant detrimental effect on the children's lives. In fact, the social worker reported that the children digressed during visits with Mother.

The record fails to show that Mother's relationship with the children was so beneficial to them that it outweighed the benefit they would gain from being adopted. (*Autumn H.*, *supra*, 27 Cal.App.4th at p. 575; *Caden C.*, *supra*, 11 Cal.5th at pp. 631, 633-634, 636.)  Accordingly, the juvenile court did not err in finding that the beneficial relationship exception does not apply in this case.

IV.

DISPOSITION

The juvenile court's orders are affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

CODRINGTON

J.

We concur:

RAMIREZ

P. J.

FIELDS

J.